**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 3:26-cr-2** |
| | ) | **Hon. Roderick C. Young** |
| **RANDON ALEXANDER SPRINKLE,** | ) | **Sentencing: September 3, 2026** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S POSITION WITH REGARD TO SENTENCING AND MOTION FOR DOWNWARD VARIANCE**

COMES NOW the defendant, Randon Sprinkle, by counsel Javionté Johnson, and files this position with regard to sentencing. Mr. Sprinkle has received and reviewed the presentence report ("PSR") with the assistance of counsel. Mr. Sprinkle objects to the application of a guideline enhancement as discussed in ECF 37. Mr. Sprinkle has no objections or corrections to the factual information contained in the PSR. Counsel has also reviewed the potential conditions of supervision with Mr. Sprinkle as outlined on pages 17-22 of the PSR.

## INTRODUCTION

Mr. Sprinkle entered a plea of guilty to Count 1 of the Amended Indictment, in violation of 18 U.S.C. §§ 2252A(a)(2)(A), Distribution of Child Pornography. ECF No. 20. Count 1 carries a 5-year mandatory term of imprisonment with a maximum term of 20 years, a fine of up to $250,000, at least 5 years of supervised release, a $100 special assessment, and full restitution. The United States Probation Officer calculated the advisory guideline range as **151 – 188** months of imprisonment, based on a total offense level of **34** and a criminal history category of **I**. This calculation is based on application of U.S.S.G. §2G2.2. PSR ¶ 25.

Mr. Sprinkle objects to the application of the specific enhancement pursuant to U.S.S.G. §2G2.2.(b)(7)(D).[1] If Mr. Sprinkle's objection is sustained, the newly calculated guideline range would be **108 – 135** months of imprisonment, based on a total offense level of **31** and a criminal history category of **I**.

Additionally, Mr. Sprinkle is seeking a downward variance based upon: 1) his history and characteristics, including his time at liberty after an interview with law enforcement, and 2) the results of his Psychosexual Evaluation and Risk Assessment. He respectfully requests that this Court vary downward from the guidelines and impose a sentence of 5 years of imprisonment, with 5 years of supervised release to follow. This sentence is sufficient and appropriate, but not greater than necessary, to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a), as it balances both the aggravating and mitigating circumstances of the offense, as well as Mr. Sprinkle's background.

## ARGUMENT

### *Applicable Sentencing Law*

After *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines are advisory, and Courts of Appeals review sentences for reasonableness. *See United States v. Hughes*, 401 F.3d 540, 546-47 (4th Cir. 2005). In *Rita v. United States,* 551 U.S. 338, 347-48 (2007), the Supreme Court held that a district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. The district court must then consider all of the factors listed in 18 U.S.C. § 3553(a) and determine if they support the sentence requested by a party. "In so doing, [the sentencing judge] may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007) (citing *Rita*, 551 U.S. at 351).

[1] *See* ECF No. 37, Mr. Sprinkle's discussion of his objection to U.S.S.G. §2G2.2.(b)(7)(D).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge *to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate*, sometimes magnify, the crime and the punishment to ensue." *Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) (citing *Koon v. United States*, 518 U.S. 81, 113 (1996) (emphasis added)). Indeed, the Court in *Gall* rejected a rule that required "extraordinary circumstances" be found to impose a sentence outside of the guidelines. *Gall*, 552 U.S. at 47. Such a requirement impermissibly applies "a heightened standard of review to sentences outside the Guidelines range. This is inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions." *Id.* at 49.

"Although the Guidelines range is one of the factors that courts must consider at sentencing, judges need not give the Guidelines range any particular weight." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1914 (2018) (internal citation omitted). Indeed, the "Guidelines, while helpful, are merely advisory and do not bind the Court." *United States v. Jefferson*, No. 3:16cr93, 2023 U.S. Dist. LEXIS 99688, at *13 (E.D. Va. June 7, 2023) (Lauck, J.). District courts may therefore disagree with the Guidelines range, and "may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views." *Pepper v. United States*, 562 U.S. 476, 501 (2011) (citing *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007)). *See also Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963 (2018) (noting that a court "has the legal authority to impose a sentence outside the range either because [it] 'departs' from the range (as is permitted by certain Guidelines rules) or because [it] chooses to 'vary' from the Guidelines by not applying them at all").

Variances are an important tool in applying the appropriate, individualized sentence for a particular case. As Justice Stevens observed, "The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters

such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider." *Rita*, 551 U.S. at 364-65 (Stevens, J., concurring).

In addition to the advisory Guidelines range, the statutory factors that must be considered in determining a just sentence include: the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with appropriate correctional treatment, *id.* at § 3553(a)(2); the kinds of sentences available, *id.* at 3553(a)(3); the need to avoid unwarranted disparity among defendants with similar records and conduct, *id.* at § 3553(a)(6); and the need to provide any restitution to any victims of the offense, *id*. at § 3553(a)(7). The primary directive of § 3553(a), of course, is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. The factors enumerated in § 3553(a) are not the only factors that this Court should consider in imposing a downward variance.

***1. The Nature, Circumstances, and Seriousness of the Offense***

Mr. Sprinkle understands that minor victims are one of the most vulnerable populations one can commit a crime against. Therefore, he recognizes the severity of his actions and takes full responsibility for such. The guidelines also consider the nature of the crime as he was assessed specific conduct enhancements. However, Mr. Sprinkle is not a violent individual as defined under U.S.S.G. §4B1.2(a).

Mr. Sprinkle wishes to inform the Court as to the exact conduct that he engaged in, as a surface reading of the PSR, without additional context, may lend a different interpretation. Mr.

Sprinkle is convicted of distributing a single video to an undercover Federal Bureau of Investigations ("FBI") agent. That is the primary conduct for which his conviction is based upon. The secondary or collateral conduct that Mr. Sprinkle engaged in, which is the primary driver of the guidelines, was the possession of child pornography and engaging in "dirty talk". "Dirty talk" in the context of Mr. Sprinkle's case is conversations surrounding taboo sexual topics or kinks. The supermajority of Mr. Sprinkle's conversations with individuals online involved this "dirty talk". According to Mr. Sprinkle, the escalation in frequency in which he engaged in "dirty talk" began after the COVID-19 pandemic in 2020 due to his social isolation. (*See* Psychosexual Evaluation and Risk Assessment by Dr. Flower attached as Exhibit A, pg. 6). Nothing about the offense involves the use of controlled substances.

A) <u>Distribution Involved a Single Video at the Behest of the Undercover Officer</u>

Mr. Sprinkle began conversing with the undercover FBI agent ("UC") on a social media application ("app") called Jack'd. ECF. No 3, ¶ 10. Jack'd is a social media app for individuals who identify as gay, bisexual, transexual, or queer. The conversation between the two eventually transferred onto the Telegram app. As a gay man, Mr. Sprinkle uses the Telegram app to communicate as it is a safer messaging platform than other apps. PSR ¶ 11. Once on Telegram, the two began to engage in what Mr. Sprinkle described as "dirty talk". The sole purpose of engaging in "dirty talk" is for one's arousal or sexual gratification. According to Mr. Sprinkle, that is an aspect of gay male culture and is not uncommon. He engaged in "dirty talk" as a way to satiate his sexual desires.

Mr. Sprinkle admits that he is into taboo sexual kinks and fetishes, namely "twink" pornography. PSR ¶ 16. According to Mr. Sprinkle, "twink" pornography is a fetish that focuses on young, hairless male adults who look underaged. It does not necessarily mean underage but can venture into that realm.

While the two were engaging in "dirty talk" the UC asked Mr. Sprinkle to send videos if he had any. PSR ¶ 4. Mr. Sprinkle had not indicated that he had any videos up to that point. Nor did he indicate that he was going to send any videos up to that point. While he did send the video, it was in the context of the "dirty talk" they engaged in. It was not for any pecuniary gain nor was the act originally suggested by Mr. Sprinkle.

B) <u>Offense Involved No Contact and Mr. Sprinkle Did Not Believe He Would Make Contact with Any Minor Children</u>

The category of conduct that Mr. Sprinkle's conviction falls under is a non-contact offense. The government may argue that the offense could have escalated into a contact offense if Mr. Sprinkle was not communicating with an UC. Mr. Sprinkle would argue that position would be mistaken for a few reasons. For starters, he never thought he was going to meet up with a 9-year-old child. PSR ¶ 15. He thought that if he was going to meet up with anyone in DC, it was going to be the adult UC he was communicating with. *Id*. The reason he believed he was going to be meeting up with the UC is because it was common for him to meet up with other adults and have in-person jerk offs based upon the conversations they previously had. *Id*. Additionally, even though he admits to having thoughts about engaging in sexual activity with a minor, he would never and has never acted upon those thoughts. PSR ¶ 16. He was not arrested in the act of facilitating a sexual encounter with a minor.

C) <u>Acceptance Was Immediate When Confronted</u>

Mr. Sprinkle never minimized or denied his responsibility for the conduct that he engaged in. He accepted responsibility when the FBI confronted him about the messages between him and the UC. On October 16, 2025, he voluntarily agreed to an interview with the FBI while they executed a search warrant on his home. PSR ¶ 6. Mr. Sprinkle assisted the agents execute the

search warrant as he provided the location of his laptops and password associated with his phone. PSR ¶ 7. Mr. Sprinkle feels great shame for the conduct that he has engaged in. Ex. A at 6.

Mr. Sprinkle hopes the Court has a more comprehensive understanding of the facts and circumstances surrounding the offense. Now that the Court has the context behind the conduct, it can begin to see why it should impose the requested sentence.

***2. History and Characteristics of Randon Sprinkle***

In addition to the nature and circumstances of the offense, this Court must consider Mr. Sprinkle's history and characteristics as the "unique study in the human failings that sometimes mitigate, sometimes magnify the crime and punishment to ensue." *Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022). That history includes both the aggravating and mitigating circumstances of his life. In determining the imposition of a sentence, the Guidelines advise district courts to consider facts and circumstances about an individual's life that may be relevant.

Research has shown that certain life events can be significantly detrimental to a developing child and in turn serve as a basis for certain conduct or behavior. These life events have been deemed to be adverse childhood experiences ("ACEs"). ACE studies view ACEs as "toxic stress," that damages the function and structure of children's developing brains.[2]

The original ACE study focused on 10 ACEs including physical, **sexual**, and verbal **abuse**; physical and emotional neglect; a family member being depressed or diagnosed with other mental illness; **a family member addicted to alcohol or another substance**; **a family member in prison**; witnessing maternal domestic violence; and **losing a parent to divorce, separation, or other reason**. The results of the original study determined that the higher number of ACEs, the higher the likelihood of physical health and behavioral problems.[3]

---

[2] *See* ACEs Science 101, *available at* https://acestoohigh.com/aces-101.

[3] *See* ACEs Science 101, *available at* https://acestoohigh.com/aces-101. Interestingly, the original ACE study involved 17,000 participants that were mostly white, middle-and upper-middle class, college-educated, and were

The study explained that individuals exposed to ACEs are at a higher risk of chronic disease, posttraumatic stress symptoms including nightmares and flashbacks, avoidance of traumatic triggers including emotional numbing, and physiological hyperarousal including hypervigilance, insomnia, and behavioral problems. These symptoms "impact behavioral and emotional development as well as academic performance."[4] In fact, the connection between childhood trauma, behavioral health, and aggressive behavior in adulthood is well-established.[5] In another study conducted of urban youth (the "Burke Study"), it is noted that children with a score of 4 or more ACEs are significantly more likely than children without any ACEs (51.2% vs. 3%) to experience learning and behavior difficulty.[6] Mr. Sprinkle has had at least 4 ACEs.

D) <u>Mr. Sprinkle's Adverse Childhood Experiences</u>

Mr. Sprinkle experienced his first set of ACEs by the age of 2 and as a result, he and his brother were removed from the custody of their biological parents. He was born to a mother and father who suffered from alcohol abuse and drug addiction. PSR ¶ 47-48. His father was also incarcerated for a period of time and has an extensive criminal record. Ex. A, pg. 3; PSR ¶ 47. Child Protective Services placed the toddlers into foster care based upon a hospital's observation of neglect and infected gashes on Mr. Sprinkle's legs. Ex. A, pg. 3; PSR ¶ 55.

Mr. Sprinkle's final and most traumatic life altering ACE happened at the age of 16 when he was sexually molested by a cousin-in-law, twice his age, over the course of four months. Ex. A, pg. 5; PSR ¶ 58. He was abused approximately 25 times by the 30-year-old man during this

---

employed with jobs that provided health care, as the study was conducted by Kaiser Permanente in conjunction with the Center for Disease Prevention and Control ("CDC"). *See id.*

[4] Burke, et al. *The Impact of Adverse Childhood Experiences on an Urban Pediatric Population*, Child Abuse Negl., Nat'l Inst. of Health, at 2 (June 2011).

[5] Nancy Wolff & Jing Shi, *Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment*, Int. J. Environ. Res. Public Health, at 1910 (2012).

[6] Burke, et al., at 5.

period. PSR ¶ 58. His cousin-in-law, a youth pastor at the church, ordered him not to tell anyone about the abuse and he complied. *Id*. The abuse eventually stopped, but the damage to Mr. Sprinkle was already done and had taken root. Often times, an individual's first or early sexual encounters form the basis for how that individual views sexual activity.

When we understand the abuse that Mr. Sprinkle endured, it begins to provide context as to his "twink" fetish and his beliefs regarding sexual relationships between teenagers and adults. Mr. Sprinkle's perspective on sex and relationships between teenagers and adults was warped after the sexual abuse was inflicted upon him. He candidly admits to the FBI agents that he "does not find it wrong if minors around the age of 15-17 years old have sex with adults", as that was his experience. PSR ¶ 14. It is a credit to Mr. Sprinkle that he did not allow his abuse to be a defining characteristic as he grew into adulthood.

E) <u>Adult Life Prior to Current Conviction</u>

Even though Mr. Sprinkle suffered multiple ACEs, he lived a productive life. He grew up in a small rural town, but was able to enroll in a college prep high school academy called Surry Early College High School. Ex. A, pg. 3; PSR ¶ 56 and 75. He was a star student, a "well-behaved teacher's pet" that served as the student body president, and a member of the student government at the community college. Ex. A, pg. 3; PSR ¶ 75. The effects of his ACEs still reared its ugly head, however. Mr. Sprinkle found himself burnt out and did not finish the final remaining courses needed to earn his associate's degree. Ex. A, pg. 3. Yet, he still persevered.

He moved out of his adopted parents' home and began to work as a political servant once he graduated high school. He felt he needed to leave the home in order to fully live as an openly gay man in a conservative Christian family. *Id*. Mr. Sprinkle found himself drawn to the political sphere just as he was in high school. He became employed with political campaigns as a field organizer or other roles. *Id*. Eventually, he worked for a gubernatorial campaign between 2021 and

2023. His role during this campaign was as a Deputy Finance Director, and then Director, of the Virginia Democratic Party. *Id*. He has not been unemployed except during COVID-19 when majority of the country shut down. PSR ¶ 77-82.

F) <u>Mr. Sprinkle's Battle with his Mental Health and Urges From his Abuse</u>

According to the report by Dr. Flower, Mr. Sprinkle suffers from a mood disorder that appears in the form of depression and anxiety. Ex. A, pg. 10. Dr. Flower also notes that Mr. Sprinkle may also suffer from Bipolar II Disorder based on his reported history of hypomanic symptoms. *Id*. Bipolar II Disorder is largely a genetic disorder. Mr. Sprinkle having the disorder makes sense as he was genetically predisposed to it because his biological mother and maternal grandmother both were diagnosed with it as well. *Id*. at 4.

Ultimately, the diagnosis aligns directly with the abuse as Mr. Sprinkle reported high amounts of anxiety that began when he was a teenager. *Id.* That anxiety only became prominent after he experienced the sexual abuse at the hands of his cousin-in-law. It was unfathomably nerve-wrecking to maintain the secret of abuse he experienced for fear of ruining his religious family. But he did maintain that secret because he was ordered to by his abuser. As a result, the symptoms of anxiety and depression took hold of Mr. Sprinkle and he has dealt with it throughout his entire life.

He attempted to treat his mental health for a few months by participating in psychotherapy until June of 2023 to help regulate his emotions. Ex. A, pg. 5; PSR ¶ 69. He also discussed a heavy sense of loneliness and isolation that really took effect during COVID-19 during this treatment. Ex. A, pg. 5. The treatment was helpful for Mr. Sprinkle, but he terminated his treatment shortly after the death of his close friend and roommate, Shawn Soras. *Id*.

"His loneliness, loss of social support, lack of an intimate relationship, and increased contact" with men who engaged in "dirty talk" were all factors that exacerbated Mr. Sprinkle's

mental health. *Id*. at 9. While in isolation, he found himself battling urges that he had not dealt with before. He became increasingly interested in pornography and admits that the urges escalated over time to include depictions of younger boys. *Id*. at 6. He became substantially interested in viewing pornography that was similar to his first sexual encounters. However, Mr. Sprinkle has shown the ability to resist those urges.

G) <u>Mr. Sprinkle's Behavior Since His Interview With the FBI</u>

The Court should draw a positive inference about Mr. Sprinkle based on his behavior displayed after his interview with the FBI. The FBI declined to arrest Mr. Sprinkle on the spot for a few reasons. He was cooperative, respectful, and even assisted the agents execute the search warrant. PSR ¶ 16. By the conclusion of the interview, the FBI were convinced that Mr. Sprinkle was not engaging in sexual activity with minors, therefore did not see any reason to arrest him right then and there.

So what did Mr. Sprinkle do after confessing to the FBI? He did not flee or attempt to evade arrest, even though he had confessed to a serious federal crime. In fact, he remained in contact with the FBI. The FBI actually contacted him to schedule a meeting a couple days prior to his arrest. Mr. Sprinkle was more than willing to meet and agreed to do so, but he informed the FBI agent that he was out of the state on a work trip. He then told the FBI his exact schedule, including when he would return and his flight itinerary so that he could come meet them at their office. When Mr. Sprinkle arrived at the Richmond Airport, he was met by FBI agents and arrested.

a. *Outlook Towards His Intended Future*

Mr. Sprinkle is committed to being a productive member of society and proving to this Court he can and will do everything necessary to never be in this position again. He has been on a path of self-improvement even in the face of his arrest and conviction. He is currently housed at Northern Neck Regional Jail ("NNRJ") and has taken advantage of the programs the facility offers.

(*See* Program Completion Certificates attached as Exhibit B). As Dr. Flower recommends, Mr. Sprinkle would benefit from substance abuse treatment. Ex. A, pg. 11. It is evident that Mr. Sprinkle agreed with Dr. Flower, because he was already in substance abuse treatment when he was given the Psychosexual Risk Assessment. He completed the multi-week course on July 6, 2026, a mere 10 days after he was June 25, 2026, assessment by Dr. Flower. Ex. B, pg. 1. That means that Mr. Sprinkle did not participate in the program because he knew Dr. Flower was going to recommend such. He participated in it because he is committed to improving himself and addressing the causes that placed him in this predicament.

He has also not lost his work ethic. He has earned certificates of completion for at least two employment courses, including a Career Preparedness Certification that expires in 2031.[7] *Id*. at pg. 3 and 5. It is also displayed by the character letter he received from the jail. (*See* Letter from NNRJ Captain attached as Exhibit C). Captain Barnes went out of his way to inform the Court that Mr. Sprinkle has displayed exemplary behavior. *Id*. Furthermore, the captain confirms that Mr. Sprinkle has been employed in multiple roles within NNRJ. *Id*. He has maintained employment for 171 days[8] out of the 241 days he has been incarcerated. The fact that Mr. Sprinkle even received a character letter from a captain at the jail speaks volumes to his character and behavior. This type of character letter is rarely issued by the jail.

Most importantly, Mr. Sprinkle did not commit any new crimes, especially sex offenses, between the time he was interviewed in October 2025 to the time he was arrested in December 2025. This is evidenced by the fact that Mr. Sprinkle was not charged with any additional conduct other than that he confessed to on October 16, 2025. That behavior coupled with Mr. Sprinkle's

---

[7] If the Court grants Mr. Sprinkle's request of imposing 5 years of imprisonment, he will be able to take advantage of the certification before its expiration.

[8] This calculation includes the days Captain Barnes confirmed Mr. Sprinkle's employment, in addition to the time he will be employed up to his sentencing date.

Psychosexual Risk Assessment provides the Court with evidence that imposing a sentence of 5 years imprisonment will be a sufficient sentence, and not greater than necessary.

***3. Variance Based on Psychosexual Evaluation and Risk Assessment***

H) <u>There is a 90% Chance That Mr. Sprinkle Will Never Recidivate Based Upon His Psychosexual Risk Assessment.</u>

The question of how does Mr. Sprinkle's Psychosexual Risk Assessment lend to his cause when he is deemed to be an "average" risk of reoffending is likely a prevailing inquiry of the Court. The risk of sexual recidivism is a carefully calculated measure that accounts for a plethora of factors. Dr. Flower administered the Risk Matrix 2000S, an instrument that is deemed to be accurate in the field of forensic psychology. Ex. A, pg. 8. The Court should be aware that the label attributed to Mr. Sprinkle's risk of reoffending is a descriptive category based on a measurement. His score technically falls within the second of four categories. *Id*. The score is at the absolute minimum end of the threshold to be considered "average" risk.[9] *Id*. The measure that corresponds to Mr. Sprinkle's risk of sexual recidivism is actually 10% within 5 years of release. *Id*.

Indeed, the inverse of the measure is that there is a 90% chance that Mr. Sprinkle will not reoffend based upon the assessment. A 90% chance of anything is incredibly favorable odds. If the weather anchor, an expert on predicting weather, predicts that there is a 90% chance of rain, people will expect it to rain that day. Similarly, the gold standard for predicting sexual recidivism tells us there is a 90% chance Mr. Sprinkle will not recidivate. This Court should believe it.

Dr. Flower suggests that this remaining 10% risk can be mitigated based upon his recommendations to the Court. This is important as the Court's chief concern is to ensure that Mr. Sprinkle does not engage in any additional sex offenses. Dr. Flower suggests that Mr. Sprinkle

[9] The range for the risks categories are as follows: 0 = Category I – Low Risk; 1-2 = Category II – Medium/Average Risk; 3-4 – Category III – High Risk; 5-6 – Category IV – Very High Risk.
*See* https://www.birmingham.ac.uk/Documents/college-les/psych/RM2000scoringinstructions.pdf at pg. 11.

participate in Sex Offender Treatment. The treatment will give Mr. Sprinkle the tools to resist any urges he may feel based upon his sexual abuse. Additionally, it is recommended for him to complete substance abuse treatment and to adhere to all prescribed psychiatric medications. This can all be accomplished if the Court imposes the requested sentence of 5 years imprisonment with 5 years of supervised release to follow.

***4. The Need for the Sentence Imposed to Address § 3553(a)(2) Factors***

The sentencing factors under 18 U.S.C. § 3553(a)(2) address retribution, deterrence, incapacitation, and rehabilitation. *See Tapia v. United States*, 564 U.S. 319, 325 (2011). This Court is to determine a sentence that is sufficient, but not greater than necessary, to address these factors, "to the extent that they are applicable in light of all the circumstances of the case." *See* 18 U.S.C. §§ 3551(a), 3553(a); *Tapia*, 564 U.S. at 325. A variance from the calculated guideline range to a sentence of 5 years of imprisonment with 5 years of supervised release to follow would adequately consider the sentencing factors under § 3553(a)(2). The requested sentence will certainly promote the goals of respect for the law, deterrence, and protect the public from future crimes and is thus a sentence that is sufficient but not greater than necessary under 18 U.S.C. § 3553(a).

I) <u>Deterrence</u>

Mr. Sprinkle's case is a salient example of the deterrence this Court and Congress wish to accomplish when it sentences an individual. Mr. Sprinkle has been specifically deterred as well. He understands that he will lose, at minimum, at least 5 years of freedom based upon his conduct. His face has been plastered all over the news and social media. (*See* Media Articles attached as Exhibit D). In fact, there has been media presence at just about every court appearance except the day of his plea hearing. He has been identified as the sole subject in a press release by the Department of Justice, reported on by local media, and has even made national headlines. *Id*. He

has lost his job and all societal standing he earned through his public and political service. He also has to register on the Sex Offender Registry and cannot live within certain areas. Most importantly, he has been ostracized and will be subject to supervision for his entire life. He has lost practically everything he has ever worked for.

The general deterrent effect here is great as well. Now individuals know that they too will lose at least 5 years of their lives should they engage in this conduct. They know they will be subjected to supervision and scrutiny for the rest of their lives should they offend in the same manner as Mr. Sprinkle. They very well could be named in the media, bringing shame to their family and friends also. Undersigned counsel suspects that this case received so much media attention due to the current political landscape in America. However, it should be noted that some articles that report on Mr. Sprinkle make no mention of his political affiliation. This would suggest that Mr. Sprinkle would have received similar media coverage no matter what, meaning that others who are convicted of his same crime may receive the same media treatment. *See* Ex. D, pg. 1-2, 8-9.

J) Rehabilitation and Incapacitation

As discussed *supra*, Mr. Sprinkle's rehabilitation can be accomplished within the requested sentence. He has already begun such, and based upon Dr. Flower's recommendation, he will be able to complete it prior to his release. According to Dawn Ferdula, individuals convicted of similar offenses as Mr. Sprinkle are targeted, frequently assaulted, and placed into protective custody before the cycle completes itself. (See Dawn Ferdula Declaration, pg. 3, attached as Exhibit E). Ms. Ferdula's declaration should receive tremendous deference by the Court as she is a former BOP employee of almost 25 years. *Id*. at 1. That means that she has personally observed a plethora of BOP facilities to identify the patterns within the BOP that she attests to within her affidavit.

Ms. Ferdula explains that even if Mr. Sprinkle requests to be placed in protective custody, he will be subjected to solitary confinement for a period of time while an investigation into his request is conducted. *Id*. at 4. This isolation would inflict further trauma upon Mr. Sprinkle as his anxiety would be triggered. *Id*. He likely would not cooperate with the investigation for fear of being labeled a "snitch" on top of the sex offender label the inmates will place on him. *Id*. He would then be removed from solitary confinement, placed back in general population, and the cycle would repeat. *Id*. Therefore, while retribution is a factor in determining a sufficient sentence, it must also be balanced with an individualized assessment of the person the retribution is being exacted upon.

Mr. Sprinkle is subject to a minimum of 5 years of supervised release due to this conviction and mandatory registry on the sex offender list. Being under the continued jurisdiction of the Court will also promote both general and specific deterrence and will protect the public, as he will be supervised by a U.S. Probation Officer and then the Sex Offender Registry. As discussed *supra*, there is an extremely low percentage possibility that Mr. Sprinkle will commit future sex offenses and is highly motivated to abide by all conditions imposed upon him. Therefore, an imposition of the requested sentence essentially guarantees that Mr. Sprinkle will not engage in further criminal conduct. As such, imposing a sentence of 5 years of imprisonment with 5 years of supervised release to follow will adequately address the sentencing factors under Section 3553(a).

***5. The Need to Avoid Unwarranted Sentencing Disparities***

Section 3553(a) also admonishes courts to avoid unwarranted disparities. This concept has some tension with the well-established principle that sentencings should be individualized and tailored to the specific person under the specific circumstances. Thus, the court is not to avoid all disparities, only *unwarranted* disparities. In light of the foregoing, the requested sentence will not

create any unwarranted disparity and will adequately address the sentencing factors under Section 3553(a).

**CONCLUSION**

For the reasons discussed herein, a sentence of 5 years of imprisonment with 5 years of supervised release to follow is sufficient but not greater than necessary. Mr. Sprinkle respectfully requests that this Court impose the requested sentence. When imposing the term of imprisonment, Mr. Sprinkle requests this Court to include the language recommended by Dawn Ferdula on page 5.

Respectfully submitted,
RANDON SPRINKLE

By: /s/
Counsel

Javionté Johnson, Esq.
New York Bar # 5720214
Attorney for Randon Alexander Sprinkle
Assistant Federal Public Defender
Office of the Federal Public Defender
Eastern District of Virginia
701 E. Broad Street, Suite 3600
Richmond, VA 23219
(804) 565-0832
(804) 800-4214 (fax)
Javionte_Johnson@fd.org